UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AIG SPECIALTY INSURANCE COMPANY, as subrogee,<br><br>Plaintiff,<br><br>vs.<br><br>JUDE MCCOLGAN AND RAJEEV AGGARWAL,<br><br>Defendants. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

AIG Specialty Insurance Company ("AIG Specialty"), as subrogee, complains of Defendants, Jude McColgan and Rajeev Aggarwal as follows:

## INTRODUCTION

1. AIG Specialty issued a Buyer-Side Representations and Warranties Insurance Policy (the "Policy") to its insured in connection with an Agreement and Plan of Merger ("Acquisition Agreement") insured and its acquisition arm (together with insured, "Insureds") entered into acquire a software company (the "Company").

2. Jude McColgan ("McColgan") executed the Acquisition Agreement in his capacity as the Chief Executive Officer of the Company. The Acquisition Agreement defined McColgan as a "Key Employee", "Key Equityholder" and a "Knowledge" person for the purposes of the agreement. In connection with the Acquisition Agreement, McColgan made false representations to Insureds, knowing that such representations were false and/or with reckless indifference to the truth of the representations he made.

3. Rajeev Aggarwal ("Aggarwal"), a founder, former director and former advisor of the Company, made and/or provided substantial assistance to McColgan and others making false

representations to Insureds, knowing of the fraud and/or participating in a common scheme to conceal material information regarding the Company's business relationship with a key customer (the "Customer").

4. As a result of McColgan's fraudulent misrepresentations and Aggarwal's aiding and abetting of fraudulent misrepresentations, Insureds incurred a loss in excess of $75,000. Pursuant to the terms and conditions of the Policy, and after application of the Policy retention, AIG Specialty reimbursed Insureds in excess of $75,000 for their loss. As a result of this reimbursement, AIG Specialty is subrogated to Insureds' claims against McColgan, Aggarwal and any other responsible party.

5. AIG Specialty has contemporaneously filed a demand for arbitration against McColgan and Aggarwal and files this action solely to preserve the statute of limitations as to Defendants and for the purposes of enforcing the arbitration award. AIG Specialty brings this lawsuit and the contemporaneously-filed demand for arbitration to recover the damages that McColgan and Aggarwal caused Insureds, which it has standing to bring as subrogee of Insureds' claims.

## PARTIES, JURISDICTION AND VENUE

6. AIG Specialty is an Illinois corporation with a principal place of business in New York.

7. Upon information and belief, McColgan is a resident of Massachusetts. This lawsuit arises out of McColgan's fraudulent conduct in connection with the acquisition of a company that maintained its principal place of business in Boston, Massachusetts.

8. Upon information and belief, Aggarwal is a resident of Massachusetts. This lawsuit arises out of Aggarwal's fraudulent conduct in connection with the acquisition of a company that maintained its principal place of business in Boston, Massachusetts.

9. This court has jurisdiction over this case pursuant to 28 USC § 1332(a) as Plaintiff AIG Specialty and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

10. Venue is proper in this district pursuant to 28 USC § 1391(b) because upon information and belief, Defendants reside in this district and because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## SUMMARY OF FACTS

11. The Company provides software and services to customers across a variety of industries. Insureds acquired the Company to expand their offerings, basing the purchase price on a multiple of the Company's sales revenue.

12. In connection with the Acquisition Agreement, and as a basis of that agreement, the Company provided Insureds a Material Customer list. The Company represented that it had no notice that a Material Customer would be terminating its relationship after the closing:

> No Material Customer has canceled or otherwise terminated its relationship with the Company, and to the Knowledge of the Company, no Material Customer intends to cancel or otherwise terminate its relationship with the Company or to decrease materially its subscription of products or services. The Company (i) has not received any notice, and has no reasonable basis to believe, that any Material Customer shall not continue as a customer of the Company after the Closing or that such customer intends to terminate or materially modify existing Contracts with the Company or to reduce its commitments or purchases thereunder. . . No Material Customer has indicated that it shall stop purchasing or decrease the volume of purchases of materials, products or services from the Company . . .

13. Per the Acquisition Agreement, "'***Knowledge***' means, when used with respect to the Company, the actual knowledge of Jude McColgan, . . . or the knowledge such persons would have, after due inquiry with respect to the subject matter so qualified with Knowledge."

14. On February 6, 2020, the Company provided Insureds a Disclosure Schedule that included a Section 3.16 Material Customer and Material Vendor list. That Material Customer list

included Customer, with a reported 2019 revenue of in excess of $75,000. At the time the Company provided this list, McColgan and, upon information and belief, Aggarwal, knew that the Customer would not be renewing its contract with the Company.

15. Prior to the closing on the Acquisition Agreement, Customer had a contract with the Company, pursuant to which it purchased products and/or services that generated an annual revenue to the Company of in excess of $75,000.

16. On January 21, 2020, an employee at Customer emailed Clint Miller ("Miller"), the Company's Director of Account Management, and informed Miller that Customer would not be renewing its contract with the Company.

17. On January 27, 2020, Miller sent an email to the same Knowledge persons, explaining that he had confirmed that Customer is "not planning on continuing with [the Company] post contract expiration . . ."

18. Upon information and belief, McColgan and/or Aggarwal convinced Customer's employee (who had recently informed the Company that Customer would not be renewing its contract) to participate in a due diligence call with Insureds. Upon information and belief, in this call, Customer's employee informed Insureds that Customer's use of the Company's product could decline, but that it would do so because of price, not functionality or value, and reassured Insureds that it would be very difficult to remove a solution such as the Company. This information was false as the employee had already informed the Company that Customer would not be renewing its contract with Insureds and Customer had not changed its position.

19. Despite McColgan and Aggarwal's knowledge that Customer would not be renewing its contract with the Company, McColgan did not disclose this information and instead

caused Customer to be included on the Acquisition Agreement's Section 3.16 Material Customer and Material Vendor list.

20. Insureds relied on the accuracy of the information conveyed to them by the Company, through McColgan and others, and on the Customer due diligence call arranged by McColgan and/or Aggarwal. Specifically, Insureds relied on the completeness and accuracy of the information contained on the Material Customer list in Section 3.16 of the Acquisition Agreement and the certification in Section 3.16(c) that "to the Knowledge of the Company, no Material Customer intends to cancel or otherwise terminate its relationship with the Company or to decrease materially its subscription of products or services." Insureds used the information on the Material Customer list and the Section 3.16(c) certification in deciding to complete the Acquisition Agreement and in determining the purchase price and other material conditions for the acquisition of the Company.

21. As a result of Insureds' reliance on McColgan's misrepresentations and concealment of material facts, Insureds purchased the Company for an amount more than $75,000 over the amount they otherwise would have agreed to pay based on their valuation formula.

22. Pursuant to the terms and conditions of the Policy, after deducting amounts received from Customer prior to its contract expiration and after application of the Policy retention, AIG Specialty reimbursed Insureds in excess of $75,000 for their loss.

23. As a result of AIG Specialty's payment, AIG Specialty is subrogated to Insureds' claims against McColgan, Aggarwal and any other responsible party.

### COUNT I: FRAUD AS TO MCCOLGAN

24. AIG Specialty incorporates paragraphs 1 through 23 as though fully set forth herein.

25. In connection with the Acquisition Agreement, McColgan made false representations of fact to Insureds and to Knowledge persons within the meaning of the

Acquisition Agreement. These false representations included (a) falsely certifying in the Acquisition Agreement that the Company "has not received any notice, and has no reasonable basis to believe, that any Material Customer shall not continue as a customer of the Company after the Closing or that such customer intends to terminate or materially modify existing Contracts with the Company or to reduce its commitments or purchases thereunder"; (b) falsely representing to other Knowledge persons that he had "heard the opposite" when Miller informed them that the Customer contract would not be renewed; and (c) altering emails to support a false statement to Insureds' deal team that the Company had a lead on "expanding [Customer/its affiliate]" business such that "[if] we price it right, it's an excellent large expansion." McColgan also caused Customer to be listed on the Acquisition Agreement's Section 3.16 Material Customer and Material Vendor list, knowing that Customer had conveyed it would not be renewing its contract with the Company and/or with reckless disregard for whether Customer would be continuing its business relationship with the Company after its contract expiration.

26. McColgan knew that the above representations were false when made or made these representations with a reckless indifference to the truth of the assertions made.

27. McColgan made the above representations with the intent to conceal Customer's decision not to renew its contract with the Company, induce Insureds and their representatives to enter into the Acquisition Agreement, and to induce Insureds to agree to a purchase price that was based in part on the revenue generated by the contract that Customer had already stated it would not renew.

28. Insureds finalized and executed the Acquisition Agreement, agreeing to the purchase price and other material conditions in justifiable reliance on (a) McColgan's false certification in the Acquisition Agreement that the Company "has not received any notice, and has

no reasonable basis to believe, that any Material Customer shall not continue as a customer of the Company after the Closing or that such customer intends to terminate or materially modify existing Contracts with the Company or to reduce its commitments or purchases thereunder"; (b) the silence of the other Knowledge persons who had been informed by McColgan that he had "heard the opposite" when Miller informed them that the Customer contract would not be renewed; and/or (c) the altered email that McColgan sent to Insureds' deal team to support his false statement that the Company had a lead on "expanding [Customer/its affiliate]" business.

29. Insureds justifiably relied on McColgan's misrepresentations regarding the Company's business relationship with Customer in finalizing and executing the Acquisition Agreement as McColgan, as the Chief Executive Officer, was in the best position to know the Company's business relationships and Insureds were not aware of any facts that contradicted McColgan's representations.

30. As a result of Insureds' justifiable reliance on McColgan's misrepresentations and the silence of those who had received McColgan's misrepresentations, Insureds were damaged in an amount exceeding $75,000.

31. AIG Specialty reimbursed Insureds for their loss pursuant to the terms and conditions of the Policy.

32. As a result of the insurance payment, AIG Specialty may, as subrogee, pursue Insureds' claims against McColgan.

WHEREFORE, AIG Specialty Insurance Company, as a subrogee of Insureds, requests that this Court enter judgment in its favor and against McColgan in an amount in excess of $75,000 and award prejudgment and post-judgment interest; attorneys' fees, costs and other damages

incurred and to be incurred; and for any such other or further relief as the Court deems equitable and just.

**COUNT II: AIDING AND ABETTING FRAUD AS TO MCCOLGAN AND AGGARWAL**

33. AIG Specialty incorporates paragraphs 1 through 32 as though fully set forth herein.

34. As further described above, McColgan engaged in a fraud directed against Insureds.

35. Upon information and belief, in furtherance of this fraud, McColgan and Aggarwal induced a Customer employee to participate in a misleading due diligence call with Insureds' representatives. In this call, the employee made a number of misleading statements about the Company. The employee stated that the Company is very effective with what they do for Customer; explained the benefits of the Company to Customer; and misleadingly reassured Insureds that it would be very difficult to remove a solution such as the Company when in fact, that same employee had previously advised the Company that Customer would not be renewing its contract with the Company.

36. McColgan and, upon information and belief, Aggarwal, had knowledge of the fraud being perpetrated on Insureds through the concealment of Customer's decision not to renew its contract with Insureds and/or were participating in a common scheme to conceal Customer's non-renewal decision from Insureds, knowing that the Customer's contract was material to Insureds' decision to enter into the Acquisition Agreement and their determination of the purchase price for the Company.

37. Upon information and belief, McColgan and Aggarwal provided substantial assistance to the scheme to defraud Insureds by inducing Customer's employee to participate in a misleading due diligence call with Insureds' representatives.

38. As a result of McColgan's and Aggarwal's aiding and abetting of the fraudulent scheme, Insureds were damaged in an amount exceeding $75,000.

39. AIG Specialty reimbursed Insureds for their loss pursuant to the terms and conditions of the Policy.

40. As a result of the insurance payment, AIG Specialty may, as subrogee, pursue Insureds' claims against McColgan and Aggarwal.

WHEREFORE, AIG Specialty Insurance Company, as a subrogee of Insureds, requests that this Court enter judgment in its favor and against McColgan and Aggarwal in an amount in excess of $75,000 and award prejudgment and post-judgment interest; attorneys' fees, costs and other damages incurred and to be incurred; and for any such other or further relief as the Court deems equitable and just.

## **DEMAND FOR JURY TRIAL**

AIG Specialty Insurance Company hereby demands a trial by jury for all issues so triable.

Dated: July 6, 2021

Respectfully submitted,
AIG SPECIALTY INSURANCE COMPANY,
By its attorneys,

_____
Clifford V. Pascarella, II, BBO # 693463
cpascarella@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
21 Custom House Street, 5th Floor
Boston, MA 02110
Tel: (857)504-2033